Steven J. Parsons, Nevada Bar No. 363
Joseph N. Mott, Nevada Bar No. 12455
LAW OFFICES OF STEVEN J. PARSONS
7201 W Lake Mead Blvd Ste 108
Las Vegas, NV 89128-8354
(702) 384-9900
(702) 384-5900 – (fax)
Steve@SJPlawyer.com
Jmott@SJPlawyer.com

David M. Wahlquist, Utah Bar No. 3349
Adam D. Wahlquist, Utah Bar No. 12269
KIRTON | McCONKIE
2600 W Executive Pkwy Ste 400
Lehi, UT 84043-3987
(801) 426-2100
(801) 426-2101  – (fax)
dwahlqui@kmclaw.com
awahlquist@kmclaw.com

Attorneys for Plaintiff
**DONALD L. BLACKWELDER**, and
**THORNTON-TERMOHLEN GROUP CORPORATION**

## UNITED STATED DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **DONALD L. BLACKWELDER**, individually and derivatively on behalf of **THORNTON-TERMOHLEN GROUP CORPORATION**, a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>**CHARLES THORNTON**, individually; **BRIAN HOWELLS**, individually; and **AECOS, LTD.**, a Nevada corporation,<br><br>Defendants.<br>_____/ | Case No.: 2:15-cv-02373<br><br>**COMPLAINT**<br><br>1.  Breach of Management Agreement;<br>2.  Breach of the Duty of Good Faith and Fair Dealing;<br>3.  Breach of Fiduciary Duty of Loyalty;<br>4.  Aiding and Abetting the Breach of Fiduciary Duty of Loyalty;<br>5.  Constructive Fraud;<br>6.  Unjust Enrichment;<br>7.  Conversion;<br>8.  Tortious Interference with Prospective Economic Relations;<br>9.  Civil Conspiracy;<br>10.  Civil RICO 18 U.S.C. § 1964(c); and<br>11.  Constructive Trust and/or Contractual Trust.<br><br>**JURY DEMAND** |

Plaintiff **DONALD L. BLACKWELDER**, an individual, and derivatively on behalf of

**THORNTON-TERMOHLEN GROUP CORPORATION**, a Nevada corporation, by his attorneys David

*Law Offices of Steven J. Parsons*
*7201 W. Lake Mead Blvd., Ste. 108*
*Las Vegas, NV 89128-8354*
*(702) 384-9900; fax (702) 384-5900*
*Steve@SJPlawyer.com*

Page 1 of  21

1  M. Wahlquist and Adam D. Wahlquist, members of the State Bar of Utah, of KIRTON |

2  McCONKIE (*pro hac vice* applications are forthcoming) and Steven J. Parsons and Joseph N.

3  Mott of LAW OFFICES OF STEVEN J. PARSONS, allege and complain against Defendants **CHARLES**

4  **THORNTON, BRIAN HOWELLS** and **AECOS, LTD.**, and each of them, as follows:

5  <u>INTRODUCTION</u>

6  <u>The Parties, Jurisdiction and Venue</u>

7  1.      Plaintiff **DONALD L. BLACKWELDER** ("Blackwelder") is, and all times relevant

8  herein was, an individual residing in the State of Utah, and a minority shareholder in Thornton-

9  Termohlen Group Corporation.

10  2.      Plaintiff **THORNTON-TERMOHLEN GROUP CORPORATION** ("TTG") is, and at all

11  times relevant herein was, a Nevada corporation, which owned patented technology for the

12  construction of high-rise commercial buildings.

13  3.      Defendant **CHARLES THORNTON** is, and at all times relevant hereto was, an

14  individual residing in the State of Maryland, and a majority shareholder in TTG.

15  4.      Defendant **BRIAN HOWELLS** ("Howells") is, and at all times relevant hereto was,

16  an individual residing in the State of New Jersey, and a co-owner of Defendant **AECOS, LTD.**

17  ("Aecos"), which is, and at all times relevant herein was, a Nevada corporation.

18  5.      This Court possesses jurisdiction to entertain this matter pursuant to 28 U.S.C.

19  §§ 1331 and 1367 because:

20  (a)      one of Plaintiff's claims arises under federal law, 18 U.S.C. §1964; and

21  (b)      there is supplemental jurisdiction over any non-federal claims as they are

22  related to a claim in the action within the original jurisdiction of the Court.

23  6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3).

24  <u>FACTS OF THE DISPUTE</u>

25  7.      In 2006, Blackwelder was introduced to TTG by Cameron Walker ("Walker").

26  Walker was acting in his capacity as an agent of TTG to solicit investments in TTG.

27  8.      Blackwelder thereafter met with Defendant Thornton, on at least one occasion.

9.     On several occasions Blackwelder met with Mr. David Termohlen ("Termohlen").

10.    During these meetings with Thornton and Termohlen, Blackwelder was told about the history of Thornton and Termohlen's working relationships, their prior success building high-rise buildings using the TTG technology, Mr. Thornton's prominent position as founder of Thornton-Tomasetti, a world famous structural engineering firm, their business plans and strategies, and their optimistic forecasts for remarkable success marketing the TTG technology to various owners.

11.    Blackwelder was assured that Thornton-Tomasetti would be a source of significant referrals of projects that could use the TTG technology which would ultimately make all the owners of TTG very wealthy.

12.    Blackwelder was asked to invest One million dollars ($1,000,000) for which he was promised a ten percent (10%) interest in TTG.

13.    Blackwelder received from TTG a form of an offering memorandum, and an unsigned Management Agreement which was represented as the framework for the governance of TTG.

14.    He was told that the Management Agreement would be signed in the very near future, and that he and Walker would become members in TTG.

15.    Sections 1.07 and 1.08 of the Management Agreement expressly prohibit Mr. Thornton, among others, from engaging in self-dealing or competing with TTG's business of marketing the TTG technology.

16.    In reliance on the foregoing representations, Blackwelder raised One Million dollars ($1,000,000) in investment funds and deposited it with TTG between November 17, 2006 and March 23, 2007.

17.    TTG received Blackwelder's funds and used them to pay the law firm of Townsend, Townsend & Crew, ("TTC") to obtain new patents for the TTG construction system.

18.    Blackwelder's funds were also used to pay salaries for TTG's officers and for travel, marketing and other typical start-up costs.

19.     In 2008, Blackwelder was appointed and agreed to serve as President of TTG, and placed on the Board of Directors to replace Ian Peltier.

20.     Blackwelder's ownership position increased over time to the point that he ultimately owned seventeen and one-half percent (17.5%) of TTG, with Walker owning seventeen and one-half percent (17.5%), and Thornton owning or controlling the remaining sixty-five percent (65%).

21.     From the time of his initial investment, Blackwelder actively promoted the TTG system and technology.

22.     Blackwelder sought out dozens of property developers and general contractors who could potentially become customers of TTG.

23.     Thornton was aware of Blackwelder's marketing efforts and on several occasions participated in meetings around the country that Blackwelder had arranged with property developers or general contractors to explain the TTG system.

24.     Notwithstanding Termohlen's earlier success building with this unique methodology, nearly all of TTG's potential customers were reluctant to use the technology as there was no recent application of the TTG technology.

25.     In the end, none of the potential customers determined to use it in their projects.

26.     However, in 2012, TTG entered into a referral agreement with Mike Ricigliano ("Ricigliano") wherein TTG agreed to pay Ricigliano a referral fee from any amounts collected by TTG for use of the TTG technology on projects referred by Ricigliano.

27.     Upon information and belief, Ricigliano was a personal friend of Connor Butler ("Butler"), head of Intel's Velocity Group, an apparent affiliate of Intel Corp., ("Intel" and/or "Velocity Group") formed to get buildings constructed faster than under traditional construction approaches.

28.     Upon information and belief, when Butler spoke with Ricigliano about finding a way to build buildings faster, Ricigliano told Butler about the TTG technology.

29.     Upon information and belief, Ricigliano met with Butler on at least three (3) occasions to discuss the TTG technology.

30.     Upon information and belief, Plaintiffs allege Butler told Ricigliano that Intel had several new buildings planned in the near future and that Intel may be interested in using the TTG technology on those buildings.

31.     Butler had Ricigliano arrange a meeting for March 15, 2012 with Blackwelder, Thornton and Ricigliano to further discuss the possibility of Intel using the TTG technology on those buildings.

32.     Ricigliano called Blackwelder to tell him that they had finally found a potential customer who may be willing to use the TTG technology on a new building.

33.     Blackwelder called Thornton on March 9, 2012 to apprise him of the great news and to arrange for him, as TTG's head engineer, to attend the March 15, 2012 meeting with personnel from Intel in Arizona.

34.     To Blackwelder's surprise, Thornton initially inquired only whether Intel was going to pay for his airfare to Arizona.

35.     Ultimately, Thornton told Blackwelder that he was willing to meet with Butler at Thornton-Tomasetti offices in New York City, but would not fly to Arizona to meet with them unless Intel paid for his ticket.

36.     Blackwelder informed Thornton that neither option was acceptable.

37.     Although aware that Blackwelder had just been in a bad accident, and would have difficulty traveling, Thornton was so disinterested in Intel that he told Blackwelder to attend the meeting by himself.

38.     Blackwelder was scheduled for accident-related surgery on March 14, 2012, the day before the proposed meeting.

39.     When Blackwelder advised Ricigliano of Thornton's refusal to meet Butler in Arizona and of Blackwelder's physical condition, Ricigliano warned Blackwelder that TTG may not get another chance to interest Intel in TTG's technology.

*Law Offices of Steven J. Parsons*
*7201 W. Lake Mead Blvd., Ste. 108*
*Las Vegas, NV 89128-8354*
*(702) 384-9900; fax (702) 384-5900*
*Steve@SJPlawyer.com*

Page 5 of  21

40.     Blackwelder postponed his surgery and on March 15, 2012 was in the Phoenix airport at 7:30 am to meet Ricigliano for the meeting with Intel.

41.     Present at the meeting were Blackwelder, Ricigliano, Butler and Paul Smith, an Intel architect.

42.     Blackwelder made an effective presentation of the TTG technology.

43.     It was fortuitous that Smith had been an architectural student at Berkeley in 1969-1971, and "just happened to be" right across the street from where Termohlen was building the "Great Western Building",  the second of seven buildings using the TTG technique.

44.     At the meeting, he stated that he had personally watched the entire construction during his study time in Berkeley.  Smith was able to confirm all that Blackwelder represented to Butler about the TTG technology.

45.     Blackwelder's presentation, together with Smith's personal endorsement, persuaded Butler that TTG could save Intel substantial time and money if Intel used the TTG technology in constructing its building.

46.     Butler requested a follow-up meeting to discuss the terms upon which Intel could use the TTG technology.

47.     Blackwelder immediately reported their success to Thornton and advised him that Butler wanted to have a follow up meeting to discuss the terms upon which Intel could use the TTG technology.

48.     Thornton finally expressed interest in Intel's potential use of the TTG technology and said he was willing to come to Arizona for the second ("second") meeting which was scheduled for mid-May 2012.

49.     In the meantime, Blackwelder, as President, signed a Corporate Non-Disclosure Agreement ("CNDA") required by Intel and submitted it to Perry Hyder, Intel's Administrator for Non-Disclosure Agreements.

50.     Prior to hearing about Butler's request for a second meeting, Thornton had become acquainted with Brian Howells ("Howells").  Howells had invited Thornton to join him

1  as a co-owner in his new company, Aecos, Ltd. ("Aecos").

2      51.    Upon information and belief, Plaintiffs allege Thornton became an owner in
3  Aecos in or around March of 2012.

4      52.    Upon information and belief, Plaintiffs allege one of the purposes of Aecos was
5  to compete with TTG by procuring and marketing the TTG technology.

6      53.    Plaintiffs allege that to further this illicit goal, Howells sent an email to
7  Blackwelder and "uninvited" Blackwelder to the proposed "second" meeting with Butler.

8      54.    Upon information and belief, Plaintiffs allege Howells went to the second
9  meeting instead of Blackwelder.

10     55.    Following the second meeting, Thornton advised Blackwelder that he would no
11  longer be the president of TTG and purported to take over any duties attendant to that
12  position.

13     56.    Although it took Thornton several months to finalize a deal, Intel ultimately
14  entered into an agreement to use the TTG technology on the first of several buildings in
15  Bangalore, India.

16     57.    Upon information and belief, Plaintiffs allege Howells persuaded Thornton to
17  instruct Intel that the party licensing the use of the TTG technology would be Aecos, not TTG.

18     58.    Thornton did not inform the directors of TTG of this substantial departure from
19  TTG's shareholder's legitimate, investment-backed expectations.  He consequently also did not
20  obtain the required director approval to enter into this contract on behalf of Aecos, an entity
21  in which no other TTG shareholder held an interest.

22     59.    Upon information and belief, the building that was the subject of the first Intel
23  contract comprises Six hundred twenty-one thousand (621,000) square feet.

24     60.    Upon information and belief, Plaintiff alleges Intel agreed to pay Nine million
25  dollars ($9,000,000) to Aecos for a development fee on their first building (SRR3) which
26  equates to $14.49/sf for a 621,000 square foot building.

27     61.    During the period between the "second" meeting and the date of the Intel

1  agreement, Thornton repeatedly told Blackwelder that he was working on the deal and that it

2  was progressing.

3       62.   He did not tell him that the deal was for Aecos, not TTG.

4       63.   Then, without the knowledge, authorization, or consent of the other directors or

5  shareholders, Plaintiffs allege, upon information and belief, that in collusion with Howells,

6  Thornton purportedly sold the TTG technology to Aecos.

7       64.   Upon information and belief, Plaintiffs allege the purchase price was only Four

8  million dollars ($4,000,000).  Less than one-half of the fees earned on the first Intel building

9  alone.  Moreover, upon information and belief, Plaintiffs allege the payment was not due until

10  March 10, 2024 – ten (10) years later.

11      65.   Upon information and belief, the obligation was not secured and bears interest

12  only at the applicable federal rate.

13      66.   In summary, upon information and belief, Plaintiffs allege Thornton and Howells

14  colluded to convert TTG's business opportunity with respect to Intel, and untold others, from

15  TTG to Aecos; then together, stole, diverted and dissipated the sole asset of TTG for which

16  Blackwelder had invested $1 million, and wrongfully transferred it to an entity the two (2) of

17  them owned.

18      67.   In the spring of 2014, Thornton finally admitted to Blackwelder what he and

19  Howells had done.

20      68.   Upon information and belief, Intel made a payment to Aecos, of One million

21  dollars ($1,000,000) of which a part was paid to TTG.

22      69.   Thornton sent Blackwelder a check for $116,666.67, with conflicting

23  explanations as to whether the part paid to TTG was part of the TTG technology purchase price

24  or part of the Intel fees paid to Aecos.

25      70.   Ultimately, in a telephone call, Mr. Collison, Thornton's legal counsel at the time,

26  told Blackwelder that the Aecos Note is "the only asset left in TTG which is just a shell now,"

27  and that the one payment "would be his last."

## RULE 23.1 REQUIREMENTS

71.    Blackwelder is, and at all time relevant hereto was, a shareholder of TTG.

72.    This action is not a collusive effort to confer jurisdiction that the Court would otherwise lack.

73.    In June 2015, counsel for Blackwelder sent a letter to Thornton, on behalf of TTG, demanding, among other things, that "pursuant to Rule 23.1 of the Nev. R. Civ. P., Thornton, as director and President of TTG, cause TTG to commence legal action against Thornton, Howells and Aecos under the legal theories set forth [in the letter] to recover all the corporate opportunities usurped from TTG and damages flowing therefrom, as well as ownership of the TTG technology, together with such damages as appropriate for the cost of engaging in such action."

74.    Thornton has failed to take the action requested by Blackwelder.

75.    Blackwelder deems any further attempts to obtain the desired action from Thornton (the majority shareholder of TTG) to be futile.

## FIRST CAUSE OF ACTION

## BREACH OF MANAGEMENT AGREEMENT

### (Against Defendant Thornton)

76.    Plaintiffs incorporate by this reference and reallege the balance of this Complaint as though fully set forth herein.

77.    Blackwelder received from TTG a form of an offering memorandum, and a form of Management Agreement which was represented as the framework for the governance of TTG.

78.    Sections 1.07 and 1.08 of the Management Agreement expressly prohibit Thornton, among others, from engaging in self-dealing or competing with TTG's business of marketing the TTG technology.

79.    In reliance upon the terms of the Management Agreement, among other representations, Blackwelder invested One million dollars ($1,000,000) for which he was

1   promised a ten percent (10%) interest in TTG.

2       80.    TTG used and benefited from the funds Blackwelder invested.

3       81.    Thornton has breached the terms of the Management Agreement as alleged

4   herein, which conduct includes wrongful self-dealing and competing with TTG's business of

5   marketing the TTG technology.

6       82.    As a result of Thornton's breach, Blackwelder and TTG have been injured in an

7   amount to be proven at trial, in an amount not less than the minimum amount in controversy

8   required to confer jurisdiction within this Court.

9                          <u>SECOND CAUSE OF ACTION</u>

10             <u>BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING</u>

11                          (Against Defendant Thornton)

12      83.    Plaintiffs incorporate by this reference and reallege the balance of this Complaint

13  as though fully set forth herein.

14      84.    As inducement for Blackwelder's investment, Thornton, among others, agreed

15  to the terms of a Management Agreement alleged herein.

16      85.    Nevada law provides that every contract imposes upon the contracting parties

17  the duty of good faith and fair dealing.

18      86.    Blackwelder performed faithfully and completely all his duties and obligations

19  under the agreement.

20      87.    Thornton proceeded to act in a wrongful manner that was unfaithful to the

21  purpose of the contract and the justified expectations of Blackwelder were consequently

22  thwarted and denied.

23      88.    Thornton's conduct includes, but is not limited to, self-dealing and competing

24  with TTG's business of marketing the TTG technology, all in violation of the Agreement and

25  Nevada law.

26      89.    As a result of Thornton's failure to act in good faith, Blackwelder and TTG have

27  been injured in an amount to be proven at trial, in an amount not less than the minimum

1   amount in controversy required to confer jurisdiction within this Court. Thornton's conduct as

2   alleged herein was malicious, willful and oppressive, and at the very least manifests a reckless

3   indifference for the rights of Plaintiffs. As such, Blackwelder and TTG are also entitled to

4   punitive damages in an amount sufficient to punish Thornton and to make an example of

5   Thornton and to deter Thornton and others like him from engaging in the wrongful conduct

6   alleged herein.

7   <div align="center">**THIRD CAUSE OF ACTION**</div>

8   <div align="center">**BREACH OF FIDUCIARY DUTY OF LOYALTY**</div>

9   <div align="center">(Against Defendant Thornton)</div>

10   90.   Plaintiffs incorporate by this reference and reallege the balance of this Complaint

11  as though fully set forth herein

12   91.   Thornton was a director, the majority shareholder and the acting president of

13  TTG during the time of the action complained-of in this Complaint.

14   92.   As such, Thornton owed a fiduciary duty of loyalty to TTG and Blackwelder.

15   93.   Thornton breached his fiduciary duty of loyalty by, among other things, wrongfully

16  self-dealing and usurping the corporate opportunities of TTG, as alleged herein.

17   94.   Thornton knew that TTG was interested in the opportunities, that substantial

18  efforts of time and funds had been expended by TTG to market the TTG technology, but

19  Thornton, nonetheless transferred them to Aecos (in which no other TTG shareholder had an

20  interest) without obtaining disinterested director approval.

21   95.   Thornton's actions were wrongful and calculated to conceal material information

22  from TTG, its disinterested directors and shareholders, and constitute intentional misconduct,

23  fraudulent concealment and a knowing violation of the legal rights of TTG and its shareholders.

24   96.   As a result of Thornton's breach of the duty of loyalty, Blackwelder and TTG have

25  been injured in an amount to be proven at trial, in an amount not less than the minimum

26  amount in controversy required to confer jurisdiction within this Court. Thornton's conduct as

27  alleged herein was malicious, willful and oppressive, and at the very least manifests a reckless

1   indifference for the rights of Plaintiffs.  As such Blackwelder and TTG are also entitled to

2   punitive damages in an amount sufficient to punish Thornton and to make an example of

3   Thornton to deter Thornton and others like him from engaging in the wrongful conduct alleged

4   herein.

5   <u>**FOURTH CAUSE OF ACTION**</u>

6   <u>**AIDING AND ABETTING THE BREACH OF FIDUCIARY DUTY OF LOYALTY**</u>

7   (Against Defendants Aecos and Howells)

8   97.    Plaintiffs incorporate by this reference and reallege the balance of this Complaint

9   as though fully set forth herein.

10   98.    As alleged herein, Thornton was a director, the majority shareholder and the

11   acting president of TTG during the time of the action challenge in this Complaint.

12   99.    As such, Thornton owed a fiduciary duty of loyalty to TTG and its shareholders.

13   100.   As alleged herein, Thornton wrongfully breached his fiduciary duty of loyalty by,

14   among other things, self-dealing and usurping the corporate opportunities of TTG.

15   101.   Upon information and belief, Plaintiffs allege Howells and Aecos knowingly

16   participated in the breaches of fiduciary duties by facilitating the transfer of TTG assets to

17   Aecos at a below-market price and on terms that were clearly one-sided, all to the detriment

18   and damage of TTG and its investors and shareholders.

19   102.   Howells and Aecos further knowingly participated in the breaches of fiduciary

20   duties by participating in Aecos's usurpation of the Intel contract, a corporate opportunity of

21   TTG.

22   103.   As a result of the breach of the duty of loyalty, Blackwelder and TTG have been

23   injured in an amount to be proven at trial, in an amount not less than the minimum amount

24   in controversy required to confer jurisdiction within this Court.  Aecos and Howells' wrongful

25   conduct as alleged herein was malicious, willful and oppressive, and at the very least

26   manifests a reckless indifference for the rights of Plaintiffs.  As such Blackwelder and TTG are

27   also entitled to punitive damages punish Thornton and to make an example of Thornton to

1   deter Thornton and others like him from engaging in the wrongful conduct alleged herein.

2   <center>**FIFTH CAUSE OF ACTION**</center>

3   <center>**CONSTRUCTIVE FRAUD**</center>

4   <center>(Against Defendant Thornton)</center>

5   104.    Plaintiffs incorporate by this reference and reallege the balance of this Complaint

6   as though fully set forth herein.

7   105.    As alleged herein, Thornton was a director, the majority shareholder and the

8   acting president of TTG during the time of the action challenge in this Complaint.

9   106.    As such, Thornton had a fiduciary or confidential relationship with TTG and its

10   shareholders, in that Blackwelder and other shareholders reposed a special confidence in

11   Thornton so that he, will act within the law, and in equity and good conscience, and Thornton

12   is bound to act in good faith and with due regard to the interests of the minority shareholders.

13   107.    As alleged herein, Thornton breached his duties to TTG shareholders by, among

14   other things, wrongfully self-dealing and usurping the corporate opportunities of TTG, and his

15   active concealment of such wrongful misconduct.

16   108.    Thornton's conduct constitutes constructive fraud and has damages Blackwelder

17   and TTG in an amount to be proven at trial, in an amount not less than the minimum amount

18   in controversy required to confer jurisdiction within this Court.  Thornton's wrongful conduct

19   as alleged herein was malicious, willful and oppressive, and at the very least manifests a

20   reckless indifference for the rights of Plaintiffs.  As such Blackwelder and TTG are also entitled

21   to punitive damages to punish Thornton and to make an example of Thornton to deter

22   Thornton and others like him from engaging in the wrongful conduct alleged herein.

23   <center>**SIXTH CAUSE OF ACTION**</center>

24   <center>**UNJUST ENRICHMENT**</center>

25   <center>(Against Defendant Aecos)</center>

26   109.    Plaintiffs incorporate by this reference and reallege the balance of this Complaint

27   as though fully set forth herein.

110.   TTG wrongfully conferred a valuable benefit on Aecos, which includes, but is not limited to the wrongful assignment of the TTG technology.

111.   Aecos acknowledged and appreciated receipt of the benefit.

112.   Aecos failed to pay fair value for the TTG technology.

113.   Upon information and belief, and as alleged herein, Plaintiffs allege the co-owners of Aecos colluded to transfer the TTG technology without the knowledge, authorization or consent of disinterested TTG shareholders.

114.   Aecos has nevertheless accepted and retained the benefit, which in equity and good conscience rightfully belongs to TTG.

115.   Under the circumstances, it would be inequitable for Aecos to retain the benefit without payment of the value thereof.

116.   TTG has consequently been damaged in the amount of Aecos' unjust enrichment, which is to be proven at trial, in an amount not less than the minimum amount in controversy required to confer jurisdiction within this Court.

<div align="center">

**SEVENTH CAUSE OF ACTION**

**CONVERSION**

(Against Defendant Aecos)

</div>

117.   Plaintiffs incorporate by this reference and reallege the balance of this Complaint as though fully set forth herein.

118.   Aecos has wrongfully made a distinct act of dominion over, among other things, the TTG technology and TTG corporate opportunities (including, but not limited to, the Intel contract), which is inconsistent with TTG's title or rights therein or in derogation, exclusion, or defiance of such title or rights.

119.   TTG has been damaged by Aecos' conversion of TTG property in an amount to be proven at trial, in an amount not less than the minimum amount in controversy required to confer jurisdiction within this Court.  Aecos' conduct as alleged herein was malicious, willful and oppressive, and at the very least manifests a reckless indifference for the rights of

*Law Offices of Steven J. Parsons*
*7201 W. Lake Mead Blvd., Ste. 108*
*Las Vegas, NV 89128-8354*
*(702) 384-9900; fax (702) 384-5900*
*Steve@SJPlawyer.com*
                                          Page 14 of  21

1   Plaintiffs.  As such, TTG are also entitled to punitive damages to punish Thornton and to make

2   an example of Thornton to deter Thornton and others like him from engaging in the wrongful

3   conduct alleged herein.

4   <u>**EIGHTH CAUSE OF ACTION**</u>

5   <u>**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**</u>

6   (Against All Defendants)

7   120.    Plaintiffs incorporate by this reference and reallege the balance of this Complaint

8   as though fully set forth herein.

9   121.    As alleged herein, a prospective contractual relationship existed between TTG

10  and Intel.

11  122.    Defendants were well aware of this prospective relationship.

12  123.    Upon information and belief, Plaintiffs allege Defendants participated,

13  encouraged or facilitated the wrongful usurpation of the Intel contract by Aecos, as alleged

14  herein.

15  124.    Upon information and belief, Plaintiffs allege Defendants wrongfully usurped

16  TTG's contract with Intel with the knowledge and intent of injuring TTG, causing damages to

17  TTG, and harming further harming TTG and preventing the prospective relationship.

18  125.    There was no privilege or justification for the Defendants' actions.

19  126.    As a result of Defendants' wrongful conduct, TTG has been harmed in an amount

20  to be determined at trial, in an amount not less than the minimum amount in controversy

21  required to confer jurisdiction within this Court.  Defendants' conduct as alleged herein was

22  malicious, willful and oppressive, and at the very least manifests a reckless indifference for the

23  rights of Plaintiffs.  As such, TTG is also entitled to punitive damages in an amount sufficient

24  to punish Defendants and to make an example of Defendants to deter Defendants and others

25  in similar circumstances from engaging in the wrongful conduct alleged herein.

26  ...

27  ...

1

## NINTH CAUSE OF ACTION

2

## CIVIL CONSPIRACY

3

(Against All Defendants)

4    127.    Plaintiffs incorporate by this reference and reallege the balance of this Complaint

5    as though fully set forth herein.

6    128.    Upon information and belief, Plaintiffs allege Defendants and each of them have

7    colluded as alleged herein to deprive TTG of its property, damage its reputation, deprive it of

8    prospective relationships, including, but not limited to, the TTG technology and the Intel

9    contract.

10    129.    Upon information and belief, Plaintiffs allege Defendants have encouraged,

11    participated and otherwise facilitated the wrongful transfer of the TTG technology as alleged

12    herein, and have usurped the corporate opportunities of TTG, while working to conceal such

13    activity from the disinterested shareholders and directors of TTG.

14    130.    As a result of Defendants' conspiracy, TTG has been damaged and harmed in

15    an amount to be determined at trial, but in an amount not less than the minimum amount in

16    controversy required to confer jurisdiction within this Court.  Defendants' conduct as alleged

17    herein was malicious, willful and oppressive, and at the very least manifests a reckless

18    indifference for the rights of Plaintiffs.  As such, TTG is also entitled to punitive damages in an

19    amount sufficient to punish Defendants and to make an example of Defendants to deter

20    Defendants and others in similar circumstances from engaging in the wrongful conduct alleged

21    herein.

22

## TENTH CAUSE OF ACTION

23

## CIVIL RICO 18 U.S.C. § 1964(C)

24

(Against All Defendants)

25    131.    Plaintiffs incorporate by this reference and reallege the balance of this Complaint

26    as though fully set forth herein.

27    132.    Between 2012 and 2014, and upon information and belief, Plaintiffs allege

*Law Offices of Steven J. Parsons*
*7201 W. Lake Mead Blvd., Ste. 108*
*Las Vegas, NV 89128-8354*
*(702) 384-9900; fax (702) 384-5900*
*Steve@SJPlawyer.com*
Page 16 of  21

1   Defendants wrongfully caused the illicit transfer of TTG property to Aecos, including, but not

2   limited to, the transfer of TTG technology, as alleged herein.

3      133.   During this same time period, and upon information and belief, Plaintiffs allege

4   Defendants colluded to usurp the corporate opportunities of TTG as alleged herein and to

5   conceal such activity from disinterested TTG directors and shareholders.

6      134.   The combination of Defendants as pled herein constituted an "enterprise," as

7   the term "enterprise" is defined in 18 U.S.C. § 1961(4).

8      135.   Upon information and belief, Plaintiffs allege this enterprise engaged in a series

9   of violations of laws as alleged herein, in a scheme to defraud TTG and its shareholders.

10     136.   Upon information and belief, Plaintiffs allege that the acts of the enterprise

11   affected interstate commerce.

12     137.   Defendants, as the enterprise, furthered their scheme to defraud TTG and its

13   shareholders by sending and receiving communications and transfers that constitute mail and

14   wire fraud, in violation of 28 U.S.C. §§ 1341 and 1343.  In particular, Defendants and the

15   enterprise concluded the wrongful transfer and usurpation of the Intel contract by mail and

16   wire transfers.

17     138.   Defendants and the enterprise further concealed their wrongful conduct from

18   TTG shareholders and directors through material misstatements and omissions in mail and wire

19   communications to Blackwelder.  Upon information and belief, Defendants, acting in concert,

20   reassured Blackwelder that negotiations of the Intel contract for the presumed benefit of TTG

21   were progressing.  All the while, Defendants were concealing their true motive to convert TTG's

22   primary asset and the Intel contract to Aecos.

23     139.   The acts of mail and wire fraud committed by the enterprise in connection with

24   the wrongful transfer of the TTG technology, the usurpation of the Intel contract and the

25   concealment as alleged herein constitute a "pattern" of "predicate acts," as those terms are

26   defined in 18 U.S.C. § 1961.  Defendants have consequently violated 28 U.S.C. § 1962(c).

27     140.   This pattern of predicate acts has proximately harmed Blackwelder and TTG, by

1   causing them to lose TTG's primary asset and the Intel contract.

2          141.   As a result, Plaintiffs have suffered damages in the amount to be proven at trial,

3   but in an amount not less than the minimum amount in controversy required to confer

4   jurisdiction within this Court.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages

5   against Defendants, plus reasonable attorneys' fees.  Defendants' conduct as alleged herein

6   was malicious, willful and oppressive, and at the very least manifests a reckless indifference

7   for the rights of Plaintiffs.  As such, TTG is also entitled to punitive damages in an amount

8   sufficient to punish Defendants and to make an example of Defendants to deter Defendants

9   and others in similar circumstances from engaging in the wrongful conduct alleged herein.

10                          <u>ELEVENTH CAUSE OF ACTION</u>

11                  <u>CONSTRUCTIVE TRUST AND/OR CONTRACTUAL TRUST</u>

12                                (Against All Defendants)

13          142.   Plaintiffs incorporate by reference the allegations in the balance of the

14   Complaint as though fully set forth herein.

15          143.   By engaging in the wrongful conduct alleged herein, Defendants have been

16   unjustly enriched at the expense, and to the detriment, of Plaintiffs, and have improperly

17   obtained alleged rights, claims, or interests in and to TTG property.

18          144.   Pursuant to the Management Agreement alleged herein, as well common law

19   and statutory duties, Thornton was required to disclose and obtain authorization, approval

20   and/or consent from all disinterested members before undertaking the transactions challenged

21   herein.

22          145.   Upon information and belief, Defendants knowingly participated, encouraged,

23   and otherwise facilitated the wrongful conduct alleged herein, including but not limited to, the

24   transfer of the TTG technology to Aecos, the usurpation of the corporate opportunities of TTG,

25   the impermissible receipt of substantial funds wrongfully obtained from Intel and the

26   concealment such activities from the disinterested shareholders and directors of TTG.

27          146.   Thornton and those acting in active concert with him to do so, including Aecos

1  and Howells, must account to TTG and its members and hold as trustee any profit or benefit

2  derived by that person or entity from any transaction connected with the conduct of TTG's

3  business or from any use of its property, whether it be intellectual property, proprietary

4  information or corporate opportunities.

5      147.   Defendants should be required to disgorge the benefits which they have

6  wrongfully received at the expense, and to the detriment, of Plaintiffs, and a constructive trust

7  should be imposed thereon so that Defendants have no legal or equitable right, claim or

8  interest therein, but instead, Defendants and each of them be made an involuntary trustee

9  holding said property, proceeds or contracts, money, and profits derived therefrom in

10  constructive or contractual trust for Plaintiffs with the duty and obligation to convey the same

11  to Plaintiffs forthwith.

12      **WHEREFORE**, Plaintiff **DONALD L. BLACKWELDER,** an individual, and derivatively on

13  behalf of **THORNTON-TERMOHLEN GROUP CORPORATION** prays for Judgment against

14  Defendants **CHARLES THORNTON**, **BRIAN HOWELLS**, and **AECOS, LTD.**, and each of them, as

15  follows:

16      1.   On Plaintiff's First Claim for Relief, for an award of damages to Blackwelder and

17  TTG and against Thornton in an amount to be proven at trial, in an amount not less than the

18  minimum amount in controversy required to confer jurisdiction within this Court.

19      2.   On Plaintiff's Second Claim for Relief, for an award of damages to Blackwelder

20  and TTG and against Thornton in an amount to be proven at trial, in an amount not less than

21  the minimum amount in controversy required to confer jurisdiction within this Court; and also

22  for an award of punitive and/or exemplary damages in an amount sufficient to punish and

23  deter Thornton and serve as an example, to deter others like him from engaging in the

24  wrongful conduct alleged herein.

25      3.   On Plaintiff's Third Claim for Relief, for an award of damages to Blackwelder and

26  TTG and against Thornton in an amount to be proven at trial, but not less than minimum

27  amount in controversy to confer jurisdiction within this Court; and also for an award of punitive

1   damages in an amount sufficient to punish and deter Thornton and serve as an example, to

2   deter others like him from engaging in the wrongful conduct alleged herein.

3       4.      On Plaintiff's Fourth Claim for Relief, for an award of damages to Blackwelder

4   and TTG and against Howells and Aecos in an amount to be proven at trial, but not less than

5   minimum amount in controversy to confer jurisdiction within this Court; and also for an award

6   of punitive damages in an amount sufficient to punish and deter Howells and Aecos, and as

7   an example deter others like them from engaging in the wrongful conduct alleged herein.

8       5.      On Plaintiff's Fifth Claim for Relief, for an award of damages to Blackwelder and

9   TTG and against Thornton in an amount to be proven at trial, but not less than the minimum

10  amount in controversy to confer jurisdiction within this Court; and also for an award of punitive

11  damages in an amount sufficient to punish and deter Thornton, and as an example, deter

12  others like them from engaging in the wrongful conduct alleged herein.

13      6.      On Plaintiff's Sixth Claim for Relief, for an award of damages to Blackwelder and

14  TTG and against Aecos in an amount to be proven at trial, but not less than the minimum

15  amount in controversy to confer jurisdiction within this Court.

16      7.      On Plaintiff's Seventh Claim for Relief, for an award of damages to TTG and

17  against Aecos in an amount to be proven at trial, but not less than the minimum amount in

18  controversy to confer jurisdiction within this Court; and also for an award of punitive damages

19  in an amount sufficient to punish and deter Aecos, and as an example, deter others like Aecos

20  from engaging in the wrongful conduct alleged herein.

21      8.      On Plaintiff's Eighth Claim for Relief, for an award of damages to TTG and against

22  Defendants in an amount to be proven at trial, but not less than the minimum amount in

23  controversy to confer jurisdiction within this Court; and also for an award of punitive damages

24  in an amount sufficient to punish and deter Defendants and as an example deter others like

25  them from engaging in the wrongful conduct alleged herein.

26      9.      On Plaintiff's Ninth Claim for Relief, for an award of damages to TTG and against

27  Defendants in an amount to be proven at trial, but not less than the minimum amount in

1  controversy to confer jurisdiction within this Court; and also for an award of punitive damages

2  in an amount sufficient to punish and deter Defendants and, as an example, deter others like

3  them from engaging in the wrongful conduct alleged herein.

4      10.    On Plaintiff's Tenth Claim for Relief, for an award of trebled damages to TTG and

5  Blackwelder and against Defendants in an amount to be proven at trial; for reasonable

6  attorneys' fees incurred herein; and also for an award of punitive damages in an amount

7  sufficient to punish and deter Defendants, and as an example to deter others like them from

8  engaging in the wrongful conduct alleged herein.

9      11.    On Plaintiff's Eleventh Claim for Relief, for an order requiring Defendants to

10  disgorge the benefits which they have received at the expense, and to the detriment, of

11  Plaintiffs, and for the imposition of a constructive trust thereon so that Defendants have no

12  legal or equitable right, claim or interest therein, but instead, Defendants and each of them

13  are made involuntary trustees holding said property, proceeds or contracts, money, and profits

14  derived therefrom in constructive or contractual trust for Plaintiffs with the duty and obligation

15  to convey the same to Plaintiffs forthwith.

16      12.    For costs of suit incurred herein; and,

17      13.    For such other further relief as the Court may deem appropriate.

18                              **<u>JURY DEMAND</u>**

19  Plaintiffs hereby demand a jury trial as provided by the U.S. Constitution, the Nevada

20  Constitution, Fed. R. Civ. P., Rule 38(a), or as otherwise may be provided for by law.

21  Dated: Friday, December 11, 2015.

22                              LAW OFFICES OF STEVEN J. PARSONS

23                              /s/ Steven J. Parsons
                                STEVEN J. PARSONS
24                              Nevada Bar No. 363
                                JOSEPH N. MOTT
25                              Nevada Bar No. 12455

26

27